IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

**JEANETTE RODRÍGUEZ-VALENTÍN**,
*in representation of her minor son, D.A.L.R.*,

    Plaintiff,

    v.

**DOCTORS' CENTER HOSPITAL (MANATÍ), INC., et al.,**

    Defendants.

Civil No. 17-1372 (BJM)

## ORDER

Before the court is defendant Doctors' Center Hospital (Manati), Inc's ("Doctors" or the "Hospital's") post-trial motion for judgment as a matter of law, for a new trial, and/or for remittitur, brought pursuant to Fed. R. Civ. P. 50 and 59. (Docket Nos. 142, 160). Plaintiff opposes. (Docket No. 156).

After trial, the jury found that Doctors, as well as two physicians who did not go to trial, all committed acts of negligence that proximately caused damages to the plaintiff, a minor who suffers from severe cerebral palsy. The jury apportioned a combined 92% of the negligence to the physicians, and the remaining 8% to Doctors. As to damages, the jury found the costs of plaintiff's future care to be $12,996,000, and his emotional and physical pain and suffering to be $1,300,000. (Docket No. 123). Doctors' 8% share of the damages awarded comes to $1,143,680, and judgment was entered in that amount. (Docket No. 124). Doctors seeks to set aside both the finding of negligence and the amount of damages.

Doctors first contends that the jury's verdict should be set aside because there was insufficient evidence to support its finding that the Hospital, through its employees, was negligent. To the contrary, plaintiff's expert, Dr. Halbridge, testified that the Hospital's nurses violated the standard of care applicable in Puerto Rico by not discontinuing the administration of Pitocen and by failing to notify the physicians of a change in the baby's

heart rate variability. Specifically, Dr. Halbridge explained that, prior to the administration of Pitocin, the fetal heart variability was good, but after Pitocin was administered, "the fetal heart rate reactivity went down to a very minimal level indicating that the baby wasn't getting enough oxygen, enough glucose and enough blood through the placenta." (Docket No. 142-4 at 9:18-25, 10:1-6). Dr. Halbridge discussed the fetal heart monitoring strips that documented Jeanette Rodríguez-Valentín's ("Rodríguez's") labor. *Id.* at 12:8-15. He explained that these showed the mother's contractions—how often they were occurring and how long they lasted—as well as the baby's heart rate baseline, accelerations above baseline, and decelerations below baseline. *Id.* According to Dr. Halbridge, these accelerations and decelerations indicate healthy heart rate variability. *Id.* at 15:17-25. After Pitocin was administered, the strips showed flat heart rate variability during several episodes, even while Rodríguez was having contractions every two and a half minutes. *Id.* at 15:7-16; *see* 16:3-15 (identifying seven episodes or poor variability, each lasting from approximately thirty minutes to one hour). Dr. Halbridge testified that loss of fetal heart rate variability is the single most important sign that a baby is experiencing hypoxia, lack of oxygen. *Id.* at 10:13-16. Yet, the nurses attending Rodríguez during the several hours of labor after Pitocin began failed to recognize that there was a "very significant loss of fetal heart rate variability." *Id.* at 10:7-12. Dr. Halbridge opined that, on the third episode, "the nurses should have shut off the Pitocin, placed the patient on her left side, increased the I.V. fluids, given the mother oxygen by mask[,] and notified the doctor of the event." *Id.* at 16:20-24.

Failure to do so, Dr. Halbridge explained, constituted a departure from the standard of care that resulted in "significantly greater brain damage to the baby" and an aggravation of D.A.L.R.'s condition. *Id.* at 26:12-16, 27:19-21. And Doctors' expert, Dr. Alberto de la Vega Pujol, confirmed that prolonged hypoxia could cause brain damage. Dkt. 133 at 67:11-13. Further, Dr. Halbridge opined that the nurses' failure to discontinue Pitocin had "a disastrous effect," explaining as follows:

> [Stopping the Pitocin] would decrease the stimulation to the uterus. It would result in fewer contractions that were not as strong and farther apart. That would result in increased blood flow to the uterus and to the placenta. Increased blood flow to the placenta results in increased oxygen and glucose and fluids getting to the baby. . . . Continuation of the Pitocin resulted in contractions that were occurring every two to two and a quarter minutes for the remaining six hours of the labor. For the remaining six hours of the labor, the variability of the fetal heart remained nearly flat indicating that the baby was suffering from lack of oxygen, lack of glucose and lack of fluids.

(Docket No. 142-4 at 17:9, 25-27). Had the nurses notified the doctor regarding the fetal heart strip abnormalities and the fact that labor had not progressed despite strong, frequent contractions, D.A.L.R. would not, according to Dr. Halbridge, have suffered the extent of damages he did. "The result would have [been] that the Caesarean Section delivery would have been accomplished many hours earlier and that the baby would not have suffered the significant, severe degree of brain damage that the baby finally ended up with." *Id.* at 94:10-14. In other words, Dr. Halbridge's testimony supports a conclusion that the nurses' acts and omissions fell below the standard of care, and their conduct caused, at least in part, D.A.L.R.'s deficits. Though the jury easily could have reached a contrary conclusion (and Doctors points to an abundance of evidence why, in its view, the jury should have), this testimony, viewed in the light most favorable to the verdict, supports the jury's determination and precludes the relief requested. *Lama v. Boras*, 16 F.3d 473, 475 (1st Cir. 1994).

Moreover, *Blás Toledo* does nothing to change this result, despite Doctors' urgings. *See Blás Toledo v. Hospital Nuestra Señora De La Guadalupe*, 146 P.R. Dec. 267, 1998 WL 476260 (1998). In that case, the Puerto Rico Supreme Court found that two nurses could not be held liable for what ultimately proved to be a negligent administration of anesthetic where they had merely followed a doctor's orders and otherwise never participated in the process or made a decision concerning the procedure to be followed. *Id.* at 307-08. Following the doctor's orders and under the doctor's supervision, the nurses placed electrodes for an electrocardiogram on the patient to permit observation of the

patient's heart rate; prepared an anesthesia mixture; operated the anesthesia machine; placed a mask on the patient's face so she would inhale the mixture; and found a vein and injected the patient with medication. *Id.* at 278-80. The doctor was present in the room and observing these procedures the entire time, and after these acts, the patient's physiological functions were "completely under the control" of another doctor and his staff. *Id.* at 280. In other words, in *Blás*, the nurses' participation in the care of the patient was limited and carried out only under the direct supervision of the doctor. Here, in contrast, the nurses were charged with caring for Rodríguez over the course of several hours of labor while the doctor(s) only checked in periodically. Indeed, Rodríguez testified that she had no memory of seeing Dr. Peña during the labor process and that Dr. Arroyo checked on her around five or six times for a few minutes at a time but then left to take care of other patients. Dkt. 129 at 132:5-16; Dkt. 130 at 149:17-19.

Rather than undermining the verdict, *Blás* affirms several principles that are consistent with Dr. Halbridge's testimony regarding the standard of care applicable to Puerto Rico nurses. In *Blás*, the Puerto Rico Supreme Court explained as follows:

> [A] nurse should exercise a certain standard of reasonable care to see that no unnecessary harm comes to the patient, and said standard of care should be the same as the standard of care exercised by other nurses in the locality or similar localities. . . [A nurse's] duty towards the patient and with the physician is to call the latter's attention as to the patient's symptoms and complaints. Patients deserve the painstaking and responsible care of the nurses of said institutions. On many occasions the nurse is the only means of communication between the physician and the patient.

*Blás*, 146 P.R. Dec. at 307 (citing *Castro v. Municipality of Guánica*, 87 P.R.R. 690, 693 (1963). Dr. Halbridge's testimony was in keeping with these pronouncements: he explained that "the job of the nurses is to take care of the patients and be their advocate and/or protector," and he faulted the nurses for failing to call the physicians' attention to the fact that the fetus was experiencing a lack of oxygen for several extended periods. (Docket No. 142-4 at 87:11-13). Although *Blás* also explains that a nurse must carry out medical orders and may not assume the powers of a physician, thus leaving the patient "at the mercy of

the nurses' whims or desires," Dr. Halbridge's testimony did not suggest that the nurses ought to have assumed a physician's powers. *Id.* at 307 (citation and internal quotation marks omitted). Rather, he testified that the nurses should have stopped the Pitocin and immediately informed the doctor, thus avoiding devastating harm to D.A.L.R. *Blás* does not indicate that a nurse must stand by silently while observing catastrophic harm to a patient in the interest of maintaining absolute obedience to the letter, rather than the spirit, of a doctor's orders. As Doctors' interprets *Blás*, nurses would be helpless to cease administering a medication that had caused a life-threatening allergic reaction, merely because a doctor had ordered the medication and left the room. But such interpretation clearly undermines the Puerto Rico Supreme Court's admonishment that a nurse must "see that no unnecessary harm comes to the patient." *Id.* Alternatively, even if under *Blás* a nurse may not cease administration of Pitocin, the jury could still reasonably find the nurses negligent based on Dr. Halbridge's testimony, which permits a conclusion that the nurses' failure to notify the doctors of the abnormal fetal heart rate variability resulted in extended episodes of hypoxia, thus exacerbating D.A.L.R.'s condition. Finally, although Dr. Halbridge referred to a national standard of care, I am unpersuaded that the local standard of care with respect to Puerto Rico nurses differs materially from the standard of care about which he testified.

Next, Doctors argues that the verdict must be set aside because the physicians themselves were negligent, pointing me to the doctrine of efficient cause, which provides that, when one party is the "sole, and efficient cause of the damage," another's negligence during the accident, if it did not cause it, does not subject him to liability. *Toro Lugo v. Ortiz Martinez*, 113 P.R. Offic. Trans. 73, 75, 113 P.R. Dec. 56, 56, 1982 WL 210594 (1982). That doctrine is inapplicable here, where Dr. Halbridge testified that the doctors were not the sole cause of the damage to D.A.L.R. Rather, their acts and omissions caused D.A.L.R.'s brain damage, and the nurses' acts and omissions caused D.A.L.R. to suffer "significantly greater brain damage." (Docket No. 142-4 at 27:20-21). Nor is the absorption

theory applicable here. Under that theory, if one tortfeasor is only slightly responsible, the overwhelming negligence of the other tortfeasor "absorbs" the minimal negligence of the former and the latter bears all liability. *See Toro Lugo v. Ortiz Martinez*, 113 P.R. Offic. Trans. 73, 75, 113 P.R. Dec. 56, 56, 1982 WL 210594 (P. R. 1982); *see also Santiago v. Becton Dickinson & Co.*, 571 F. Supp. 904, 911-14 (D.P.R. 1983) (comparing efficient cause and absorption principles). Dr. Halbridge testified that the nurses failed to recognize that D.A.L.R. was receiving inadequate oxygen several times for extended periods, never informed the doctors of this fact, never ceased administration of the medication that was causing the lack of oxygen, and thus contributed significantly to D.A.L.R.'s brain damage. Given this testimony, a reasonable jury could conclude that the nurses were more than slightly responsible for the damage D.A.L.R. suffered. Additionally, the jury accounted for the differences between the negligence of the doctors and the nurses by finding that the physicians were responsible for a combined 92% of the damages claimed. Such is in keeping with the law of Puerto Rico, which recognizes comparative negligence. *Montero Saldana v. Amer. Motors Corp.*, 107 P.R. Dec. 452, 463 (1978) ("It has been accepted that comparative fault in cases of negligence is the most reasonable and just way of imposing liability."); *Rivera Santiago v. United States*, 2009 WL 702235, at *4 (D.P.R. Mar. 11, 2009) ("Puerto Rico is a comparative negligence jurisdiction.").

Doctors next turns its attention to the amount of damages awarded, arguing that the jury's damages awards were unsupported by evidence, or, alternatively, excessive. I disagree on both counts.

With respect to the jury's award for the cost of future care, plaintiff's expert life care planner testified that the cost of plaintiff's care would be $278,000 per year through age 18, and $379,000 per year thereafter for the remainder of the plaintiff's life. If the jury accepted this testimony, then to arrive at its award of $12,996,000 for cost of future care, it must also have found that plaintiff, who was ten years old at trial, would live for approximately another 36 years.

Doctors argues such a finding as to life expectancy was overly speculative, noting that plaintiff presented no expert testimony as to life expectancy. While the life expectancy of a child with severe cerebral palsy likely would be a proper subject for expert testimony, *see Arroyo v. United States*, 2010 WL 1437925 at *2 (N.D. Ill Apr. 2, 2010), *aff'd* 656 F.3d 663 (7th Cir. 2011) (expert testified that plaintiff with cerebral palsy enjoyed a normal life expectancy given proper care and treatment), it is a separate question whether a jury may return a verdict without expert testimony as to life expectancy. Indeed, damages in a negligence action need not be shown with mathematical certainty. *See Zambrana v. Hosp. Santo Asilo de Damas*, 9 P.R. Offic. Trans. 687, 109 P.R. Dec. 517, 521 (1980); *see also Suro v. E.L.A.*, 111 P.R. Dec. 456, 461 (1981) ("The determination of a person's work-life expectancy is not subject to a rigid a priori formula."). And courts in other jurisdictions have found that the jury or fact finder could properly determine life expectancy given evidence of plaintiff's permanent medical condition and present pain and suffering. *See Tabor v. Miller*, 389 F.2d 645, 647 (3rd Cir. 1968); *McKeown v. Woods Hole*, 9 F. Supp. 2d 32, 49 (D. Mass. 1998). Here, while the far better practice would have been for both parties to present competent expert testimony of plaintiff's life expectancy, the jury nevertheless heard substantial evidence as to plaintiff's permanent medical condition and present sufferings. The jury heard testimony from D.A.L.R.'s mother that, because of his cerebral palsy, D.A.L.R. cannot walk, speak, sit by himself, feed himself, bathe himself, or dress himself. (Docket No. 129 at 124:6-10, 152:7-10). He suffers from convulsions two or three times a week, and he always wears diapers, requiring six to ten changes per day. *Id.* at 149:7-12, 151:15-21. He recognizes neither his mother nor his father, and he was dismissed from school because of lack of control and due to difficulties related to feeding. *Id.* at 124:6-10, 149:25-150:2. A life care planner, who consulted with D.A.L.R., his parents, and his doctors, testified that D.A.L.R. requires regular physical therapy, occupational therapy, speech therapy, and massage therapy, as well as routine appointments with a neurologist, pediatrician, and physiatrist. (Dkt. 142-3 at 17:19-25, 22:2-4). He also requires a

wheelchair, bilateral ankle foot orthotics, a thoracic lumbar sacral orthotic, a power bed, lifts, slings, and a special mattress to avoid injury from immobility. *Id.* at 18:4-7, 19:1-4, 20:8-25. In other words, the jury heard testimony sufficient to inform, together with the jury's "logic, common sense, personal knowledge, and experience," a reasonable estimate as to life expectancy. *Rios Ruiz v. Mark*, 19 P.R. Offic. Trans. 862, 119 P.R. Dec. 816, 842 (1987). In addition to lack of expert testimony as to life expectancy, Doctors also points to other alleged inconsistencies and deficiencies in the life care planner's testimony and methodology, most of which it argued to the jury, which apparently disagreed. As the finder of disputed facts in the case, the jury was within its bounds to do so.

I also do not find that the amounts awarded for both future care and pain and suffering were overly excessive or shock the conscience so as to warrant a new trial or remittitur. As mentioned above, the future care damages were supported by the testimony of plaintiff's life care planner. As to pain and suffering, the jury heard testimony from the life care planner and plaintiff's family regarding the extreme challenges and suffering plaintiff faces every day of his life and in nearly every aspect of his life. Though undoubtedly generous, neither award is "grossly excessive" or "exaggeratedly high." *See Suero-Algarin v. CMT Hospital HIMA San Pablo Caguas*, 957 F.3d 30, 45 (1st Cir. 2020) (citing *Santiago Montañez v. Fresenius Medical Care*, 195 P.R. Dec. 476 (2016)).

Doctors also maintains the jury's verdict must be set aside because the court declined to instruct the jury regarding comparable awards in similar cases, as the Hospital claims is required by the Puerto Rico Supreme Court's decision in *Fresenius*. However, the First Circuit recently held that *Fresenius* dealt with a procedural, and not a substantive matter, noting the potential for "unsettling the federal scheme of jury trials in federal cases" should the trial court be required to work the comparative analysis into the jury's deliberative task, as Doctors advocates here. *See Suero-Algarin*, 957 F.3d at 45 n.16. Doctors has cited no case supporting its argument that such an instruction may be given in

Rodríguez-Valentín v. Doctors' Center Hospital (Manatí), Inc., et al., Civil No. 17-1372 (BJM)     9

a federal civil jury trial, much less that it is required, and I decline its invitation to so hold here.

Finally, I have considered the other arguments raised in Doctors' motion and also find them without merit.

Motion denied.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 22nd day of October, 2020.

                                    *S/ Bruce J. McGiverin*
                                    BRUCE J. MCGIVERIN
                                    United States Magistrate Judge